Approved: _____
JARED LENOW
Assistant United States Attorney

Before: HONORABLE KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York

20 MAG 5114

---------------------------------
UNITED STATES OF AMERICA

- v. -

WILLIAM SADLEIR,

                    Defendant.
---------------------------------

**SEALED COMPLAINT**

Violations of 18 U.S.C. §§
2, 1028A, and 1343

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

DANIEL MARDAKHAYEV, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

**COUNT ONE**
**(Wire Fraud – Advertising Scheme)**

1. From at least in or about 2016, up to and including in or about March 2020, in the Southern District of New York and elsewhere, WILLIAM SADLEIR, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SADLEIR, who was the chairman and chief executive officer of Aviron Pictures, LLC (together with its affiliated entities, "Aviron"), misappropriated millions of dollars in investor funds from Aviron for his own personal use through fraud and deceit, including through the use of a sham company he created to carry out the scheme.

(Title 18, United States Code, Sections 1343 & 2.)

**COUNT TWO**
**(Wire Fraud – UCC Scheme)**

2.    In or about 2019, in the Southern District of New York and elsewhere, WILLIAM SADLEIR, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SADLEIR caused the forging of the signature of one of the managers of an investment fund (the "Fund") that invested in Aviron on documents used to remove liens on Aviron assets that secured loans made by the Fund to Aviron, and SADLEIR then sold the Aviron assets without the Fund's consent.

(Title 18, United States Code, Sections 1343 & 2.)

**COUNT THREE**
**(Aggravated Identity Theft – UCC Scheme)**

3.    In or about 2019, in the Southern District of New York and elsewhere, WILLIAM SADLEIR, the defendant, willfully and knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, SADLEIR possessed, used, and transferred the name of another person in connection with the wire fraud scheme charged in Count Two of this Complaint.

(Title 18, United States Code, Section 1028A.)

The bases for my knowledge and for the foregoing charge are, in part and among other things, as follows:

4.    I have been a Special Agent with the FBI since 2019.  I am currently assigned to a squad within the New York Division responsible for investigating violations of federal securities laws and related offenses.  I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals.  Because this affidavit is being submitted for the limited purpose of

establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

## RELEVANT ENTITIES AND INDIVIDUALS

5.     From my review of documents from the Fund, financial institutions, the State of Delaware, and an escrow company, as well as public filings and other publicly-available information, and from speaking with one of the individuals currently responsible for managing Aviron Pictures, LLC, I have learned the following, in substance and in part:

a.     The Fund is a publicly-traded, closed-end investment fund.  Shares in the Fund trade on the New York Stock Exchange.   As of in or about December 2019, the Fund had approximately $649.1 million in assets.   The Fund was managed by an investment adviser (the "Investment Adviser") whose principal place of business is New York, New York.   The Investment Adviser is registered as such with the United States Securities and Exchange Commission (the "SEC").   The Investment Adviser in turn utilized several other SEC-registered investment advisers (the "Sub-Advisers"), which also have their principal places of business in New York, New York, to perform the day-to-day management of the Fund's investments, including investments relating to Aviron.

b.     WILLIAM SADLEIR, the defendant, was the chairman and chief executive officer of Aviron Pictures, LLC, and oversaw its operations, from in or about 2015 until in or about December 2019.

c.     At all times relevant to this Complaint, Aviron Pictures, LLC, was a film production and distribution company based in Los Angeles, California and formed under the laws of Delaware. Aviron Pictures, LLC was founded in or about 2015, and participated in the distribution of a number of films in the United States, including *My All American* (2015), *Kidnap* (2017), *The Strangers: Prey at Night* (2018), *A Private War* (2018), *Destination Wedding* (2018), *Serenity* (2019), and *After* (2019).   SADLEIR and Aviron Pictures, LLC operated through multiple related legal entities also based in Los Angeles, California, and formed under the laws of Delaware, including Aviron Capital, LLC, Aviron Releasing, LLC, Aviron 1601, LLC, MAA Releasing, LLC, and Aviron Group, LLC, among

other entities (collectively referred to herein as "Aviron").[1] Aviron Group formally operated as a holding company for Aviron Pictures, Aviron Capital, and Aviron Releasing.

d.    Temerity Trust Management, LLC ("Temerity Trust") was an entity controlled and used by SADLEIR to hold his ownership interests in Aviron Group, among other things.  SADLEIR also used Temerity Trust to establish a sham entity used in furtherance of the fraudulent scheme charged in Count One, and to purchase real estate using the proceeds of that scheme.  According to the Limited Liability Company Agreement for Temerity Trust, SADLEIR's spouse (the "Spouse") formed Temerity Trust under the laws of the State of Delaware on or about October 14, 2015, and at or about the time of its formation the Spouse was its sole member.[2]  As of at least in or about 2017, SADLEIR held himself out as the Managing Member of Temerity Trust.

e.    An individual referred to herein as the "Aviron IT Employee" was an information technology specialist employed by Aviron from at least in or about 2017 through in or about April 2020.

## OVERVIEW OF THE FRAUDULENT SCHEMES

6.    As set forth below, WILLIAM SADLEIR, the defendant, participated in two fraudulent schemes (together, the "Schemes") relating to an approximately $75 million investment made by the Fund in Aviron.

7.    In one of the schemes (the "Advertising Scheme"), WILLIAM SADLEIR, the defendant, misappropriated millions of dollars in funds from Aviron that had been invested in Aviron by the Fund.  SADLEIR represented to the Fund that this money had been invested by Aviron in pre-paid media credits[3] with the advertising placement company MediaCom Worldwide, LLC ("MediaCom"), which is a subsidiary of the advertising and media agency GroupM Worldwide Inc. ("GroupM Worldwide").  Instead, SADLEIR, using the bank account for a sham entity he had created, illicitly transferred out of Aviron over $25 million of those funds.  Specifically, SADLEIR created a sham New York-based company

---

[1] When discussed individually herein, each of these entities is referred to without the "LLC" aspect of its legal title.
[2] The Spouse was also employed by Aviron.
[3] Pre-paid media credits, also referred to as "up fronts," are advance payments for media advertising that can be redeemed for specific media advertising at a later time.

called GroupM Media Services, LLC (the "Sham GroupM LLC") designed to appear as if it was the legitimate entity, GroupM Worldwide, and a corresponding bank account in the name of that sham entity. SADLEIR then used a significant portion of those illicitly transferred funds for his personal benefit, including to purchase a private residence in Beverly Hills for approximately $14 million. SADLEIR then falsely represented to the Fund that Aviron had purchased an approximately $27 million balance in pre-paid media credits with MediaCom that were available to promote future Aviron films, and pledged a portion of those credits to the Fund as collateral for additional loans, when in fact the claimed credits did not exist due to SADLEIR's misappropriation.  As part of these false representations, SADLEIR also created a fake identity of a purported New York-based female employee of the Sham GroupM LLC named "Amanda Stevens" who corresponded with a representative of the Fund, ensuring the Fund that Aviron had an approximately $27 million balance in pre-paid media credits with the Sham GroupM LLC.  In fact, SADLEIR himself posed as Amanda Stevens when engaging in email exchanges with a representative from the Fund.

8.    In the other scheme (the "UCC Scheme"), WILLIAM SADLEIR, the defendant, engineered the illicit and fraudulent sale and refinancing of assets worth an estimated $3 million that secured the Fund's loans to Aviron.  The Fund had secured its investment in Aviron by, among other means, obtaining UCC liens in 2017 and 2018 on certain intellectual property and other assets relating to Aviron's films.  In 2019, SADLEIR used the forged signature of one of the Fund's portfolio managers ("Manager-1")[4] on releases to remove the Fund's UCC liens on certain of these secured assets in order to sell or refinance them without the Fund's consent, thus depriving the Fund of its collateral on outstanding loans, loans on which Aviron ultimately defaulted.

## THE ADVERTISING SCHEME

### Background

9.    From reviewing documents provided by the Fund, a bank headquartered in New York, New York ("Bank-A"), a bank headquartered in Pasadena, California ("Bank-B"), GroupM Worldwide and MediaCom, and an escrow company that assisted WILLIAM SADLEIR, the defendant, in his purchase of residential property (the "Escrow Company"), I have learned the following, in substance and in part:

---

[4] Manager-1 was a Managing Director at one of the Sub-Advisers.

a.   Aviron Pictures and MediaCom entered into a Master Services Agreement made effective as of on or about August 1, 2015 (the "2015 MediaCom Agreement"), which included a provision providing for the pre-purchase of discounted media by Aviron Pictures from MediaCom and its affiliate GroupM Worldwide. MediaCom and GroupM Worldwide are both based in New York, New York.

b.   On or about October 20, 2015, the Fund agreed to extend credit to Aviron Capital, a financing affiliate of Aviron Pictures, to finance prints, advertising, marketing, and promotion of feature-length motion pictures pursuant to a credit and security agreement (the "Credit Agreement").  The Credit Agreement provided for an initial loan of $12 million to finance the distribution of the film *My All American*, among other things, and further provided that the Fund may provide subsequent loans to finance additional films.  The Credit Agreement also gave the Fund a security interest in intellectual property and other assets relating to *My All American*.  SADLEIR signed the Credit Agreement in his capacity as the Manager of Aviron Capital.  On the same date, October 20, 2015, Aviron Group, which owned all equity in Aviron Capital and Aviron Pictures, separately agreed to pledge its equity interests in those wholly owned subsidiaries as collateral for the Fund's extension of credit to Aviron Capital (the "Equity Pledge Agreement"). SADLEIR signed that agreement in his capacity as President of Aviron Group.

c.   Also on or about October 20, 2015, the Fund wired approximately $12 million to an Aviron Capital account at Bank-B with account number ending in 5748 ("Aviron Capital Bank Account-1").  At the time, SADLEIR was one of the individuals with signatory authority over Aviron Capital Account-1.

d.   On or about October 7, 2016, a certificate of formation for the Sham GroupM LLC was filed in Delaware.  According to the Limited Liability Company Agreement for the Sham GroupM LLC, its Manager was SADLEIR and its sole member was Temerity Trust (whose Manager was listed as the Spouse).

e.   On or about October 18, 2016, SADLEIR opened an account at Bank-A in the name of the Sham GroupM LLC with account number ending in 8082 (the "Sham GroupM Bank Account").  Statements for the Sham GroupM Bank Account were mailed to the same address on Wilshire Boulevard in Los Angeles, California as account statements for Aviron.

f.   On or about October 19, 2016, the Credit Agreement was amended to provide for, among other things, the financing of

an additional film, *Drunk Parents*.[5]   The amendment provided that the entity Aviron 1601, LLC could serve as the direct borrower for certain funds provided by the Fund in connection with *Drunk Parents*.   SADLEIR signed the amendment in his capacity as the Manager of Aviron Capital and the Manager of Aviron 1601.

g.   On or about October 20, 2016, a Statement of Information for the Sham GroupM LLC was filed with the California Secretary of State, listing the entity's place of organization as Delaware, its Manager as "William K. Sadleir," and its agent for service of process as the Spouse.

h.   On or about January 12, 2017, Aviron Pictures, the Fund, and MediaCom entered into a letter agreement providing, in substance and in part, that, upon request, unused funds from media pre-purchases would be refunded to the Fund (or to Aviron, with the Fund's consent).   SADLEIR signed the agreement in his capacity as Manager of Aviron Pictures.

### SADLEIR's Use of the Sham GroupM LLC to Misappropriate Investor Funds

10.   From reviewing materials provided by the Fund, Bank-A, Bank-B, GroupM Worldwide and MediaCom, and the Escrow Company, I have learned the following, in substance and in part:

a.   On or about February 24, 2017, the Fund wired approximately $21 million to an account in the name of Aviron 1601, LLC, at Bank-B, with account number ending in 8642 (the "Aviron 1601 Bank Account"), pursuant to the Credit Agreement.   At the time, WILLIAM SADLEIR, the defendant, was one of the individuals with signatory authority over the Aviron 1601 Bank Account.   Per agreement with the Investment Adviser, monthly statements for the Aviron 1601 Bank Account were sent to both Aviron and the Investment Adviser.   Three days later, on or about February 27, 2017, SADLEIR caused $12,134,000 to be wired from the Aviron 1601 Bank Account to the Sham GroupM Bank Account.   From reviewing bank statements for the Sham GroupM Bank Account, the only expenditure I was able to locate that appeared to relate to media or advertising purchases or expenses was one $150,000 cashier's check drawn on the account on or about March 20, 2017 that was made out to "MEDIACOM" from "Aviron Pictures" for the film *Drunk Parents*.[6]

---

[5] Aviron Pictures ultimately did not serve as the distributor for *Drunk Parents*.

[6] It does not appear that the Sham GroupM LLC's name would have

Many of the other expenditures reflected in that account include what appear to be personal expenditures by SADLEIR, such as the following:

       i.   A $420,000 wire transfer on or about June 21, 2017 to the Escrow Company for a down payment on a residence in Beverly Hills (the "Beverly Hills Residence") that SADLEIR agreed to purchase on or about June 16, 2017 through Temerity Trust for approximately $14 million.

       ii.   Thousands of dollars in other expenditures in connection with SADLEIR's purchase of the Beverly Hills Residence, such as a wire of approximately $35,000 on or about September 21, 2016 to an interior design firm and checks totaling approximately $1,776 for chimney inspectors in or about the summer of 2017.

       iii.   An approximately $27,000 wire transfer on or about September 19, 2017 to a private jet charter company.

       iv.   An approximately $127,000 payment to Tesla Motors on or about October 11, 2017. From reviewing SADLEIR's Department of Motor Vehicles records, I have learned that he currently owns a 2017 Tesla Model X.

       b.   On or about July 17, 2017, the Fund and Aviron Capital entered into a note purchase and security agreement (the "2017 Note Purchase Agreement") to refinance the credit arrangements under their earlier agreements and to provide capacity to finance the distribution of additional movies by Aviron, including *Kidnap*. The 2017 Note Purchase Agreement increased the amount of credit extended by the Fund to $75 million. The agreement also gave the Fund a security interest in certain intellectual property and other assets relating to the films *My All American*, *Drunk Parents*, *Kidnap*, and potential future Aviron films. SADLEIR signed the agreement in his capacity as Manager of Aviron Capital. Also on or about July 17, 2017, the Fund entered into an omnibus amendment agreement with Aviron Group, Aviron Pictures, and MAA Releasing, providing, among other things, and in substance and in part, that all references to the Credit Agreement in the Equity Pledge Agreement would be replaced by references to the 2017 Note Purchase Agreement, and affirming that the Equity Pledge Agreement would remain in effect. SADLEIR signed the

---

been printed on this cashier's check. Rather, the bank records indicate that it would have appeared to have been a check from Aviron Pictures.

amendment in his capacity as Manager of Aviron Group, Aviron Pictures, and MAA Releasing.

c. On or about July 18, 2017, the Fund wired $40,629,615.63 to Aviron Capital Bank Account-1. Also on or about July 18, 2017, SADLEIR sent an email from a particular Aviron email address ("Sadleir Aviron Email Account-1") to a representative of Bank-B, stating, in substance and in part, that "Aviron Capital should be receiving an incoming wire from [the Fund] today in the amount of 40,696,615.63 to its collection account, number ending in 5748," and providing instructions for the transfer of some of those funds. A portfolio manager for the Fund ("Manager-2")[7], and others, were copied on the email. A portion of those funds appears to have been misappropriated by SADLEIR to pay for the purchase of the Beverly Hills Residence through the following series of transfers:

i. On or about August 10, 2017, approximately $9,475,000 was wired from Aviron Capital Bank Account-1 to an Aviron Capital account at Bank-A with account number ending in 3036 ("Aviron Capital Bank Account-2"). At the time, SADLEIR was one of the individuals with signatory authority over Aviron Capital Bank Account-2. Approximately two months later, on or about October 11, 2017, an additional approximately $4,250,642 was wired from Aviron Capital Bank Account-1 to Aviron Capital Bank Account-2.

ii. On or about October 16, 2017, approximately $13,525,000 was transferred from Aviron Capital Bank Account-2 to the Sham GroupM Bank Account.

iii. On or about October 17, 2017, approximately $13,515,156.60 was wired from the Sham GroupM Bank Account to the Escrow Company to pay for the Beverly Hills Residence. The nominal purchaser of the Beverly Hills Residence was Temerity Trust, but SADLEIR executed the purchase and escrow documents for the Beverly Hills Residence as the Managing Member of, and Authorized Signor for, Temerity Trust, and the Escrow Company that facilitated the purchase dealt directly with SADLEIR as a representative of Temerity Trust. For example, in a June 21, 2017 email, a representative of the Escrow Company emailed SADLEIR at Sadleir Aviron Email Account-1, and said, in substance and in part, "Hello Mr. Sadleir: Attached please find opening escrow paperwork for your purchase [of the Beverly Hills Residence]."

---

[7] Manager-2 was a Director at one of the Sub-Advisers.

### SADLEIR's Continued Misrepresentations Concerning the Sham GroupM LLC to Secure Additional Investment Funds

11.   From reviewing materials provided by the Fund, including emails, an audio recording, and other materials; documents provided by Bank-A; and documents from GroupM Worldwide and MediaCom, as well as from speaking with a representative of GroupM Worldwide, I have learned the following, in substance and in part:

   a.   On or about March 12, 2019, WILLIAM SADLEIR, the defendant, sent an email to Manager-2 purporting to detail the substantial pre-paid media credit assets held by Aviron Pictures' financing affiliate, Aviron Capital. The email attached the 2015 MediaCom Agreement and documents "reflecting the payments to GroupM Media Services," and stated:

> Some of the payments were wired from other banks, and the payments Aviron Capital made were bank account transfers since GroupM banks at [Bank-A], as do we. . . . I'll track down and forward the emails that detail how to have our own media planning company coordinate with GroupM's media traffic desk to apply our banked national television media towards specific television campaigns for films being released by Aviron Pictures.

The signature block for SADLEIR's email included a cellphone number ending in 6969 (the "Sadleir Cellphone Number"). One of the attached documents was an accounting spreadsheet that purports to reflect a total of $28,597,000 in pre-paid media credits purchased by Aviron Capital between in or about November 2016 and in or about January 2018.

   b.   On or about March 15, 2019, Manager-2 sent an email to SADLEIR at another Aviron email address ("Sadleir Aviron Email Account-2"), copying Manager-1, and stating, in substance and in part, that the Fund needed resolution about whether $10 million of Aviron Capital's unused pre-paid media credits could be relied on as collateral for potential additional loans from the Fund. On or about March 18, 2019, SADLEIR responded to Manager-2 from Sadleir Aviron Email Account-2, copying Manager-1, stating, in substance and in part, "we have confirmation from GroupM that the national television media that was banked remains available to Aviron Pictures to use on future Aviron films, regardless of the fact that we no longer use MediaCom (a GroupM company) as our advertising agency." Manager-2 in turn responded to SADLEIR at Sadleir Aviron Email Account-2, copying Manager-1, stating, in substance and in part, "[w]ithout receiving something in writing from Group M, we have little certainty that they would take

direction from us.  Perhaps, you could share a contact at the comp[any [sic] and we would be glad to speak to them." SADLEIR replied to Manager-2 from Sadlier Aviron Email Account-2, copying Manager-1, stating, in substance and in part, "GroupM wouldn't take direction from you because the contract is exclusively with Aviron Pictures.  But, we'd take direction for you."

c.    On or about March 22, 2019 and on or about March 25, 2019, the Fund, SADLEIR, Aviron Capital, and Temerity Trust signed agreements providing for the extension of an additional $10 million in loan funds for use in connection with the film *After*. Under these agreements, SADLEIR and Temerity Trust pledged their entire membership interests in Aviron Group to secure the loans from the Fund, with the entities owned by Aviron Group listed as including Aviron Pictures; Aviron Releasing; and Aviron Capital and its wholly owned subsidiaries, including MAA Releasing, LLC, Aviron 1601, LLC, Aviron 1701, LLC, Aviron 1702, LLC, Aviron 1704, LLC, Aviron 1705, LLC, Aviron 1706, LLC, and Aviron 1801, LLC. Aviron Capital agreed to use unused pre-paid media credits with "Group M, the parent of Mediacom" as collateral for the $10 million in loans.  SADLEIR was a signatory to those agreements on his own behalf, and also in his capacity as Manager of both Aviron Capital and Temerity Trust.

d.    Between on or about March 25 and on or about March 26, 2019, the Fund wired a total of approximately $10 million to an Aviron Capital account at Bank-A with account number ending in 0956 ("Aviron Capital Account-3").  At the time, SADLEIR was one of the individuals with signatory authority over Aviron Capital Account-3.

e.    In a letter dated July 1, 2019 (but actually sent on or about July 9, 2019), the Fund notified Aviron Capital, in substance and in part, that Aviron Capital was in default on its loan payments and other obligations.

f.    On or about September 16, 2019, an individual in the finance and accounting department at Aviron Pictures sent an email to Manager-2, copying SADLEIR at Sadleir Aviron Email Account-2, stating, in substance and in part, that the email was attaching documents constituting the "backup given to the CPAs for the $28,522,000 in Prepaid Media." Those documents included, among other things, purported MediaCom forms showing the pre-purchase of approximately $27 million in media for Aviron, with instructions that funds for the pre-purchase of media be wired to the Sham GroupM Bank Account.  Four separate such forms, each bearing SADLEIR's signature, memorialize the following approximate purported purchase amounts on or about the following dates:

   i.   October 18, 2016: $2,557,800

   ii.   December 13, 2016: $460,000

   iii.   February 17, 2017: $12,134,200

   iv.   October 10, 2017: $13,525,000[8]

12. Based on my discussion with a representative of MediaCom, I have learned that these purchases never took place, and that in or about September 2019 Aviron did not have a pre-paid media balance with MediaCom or GroupM Worldwide.

### SADLEIR's Use of the Fake "Amanda Stevens" Identity to Deceive the Fund into Continuing its Support of Aviron

*Sadleir Directs the Establishment of the Sham Company's Web Presence and the "Amanda Stevens" Email Account*

13. From reviewing materials provided by the Fund, GroupM Worldwide and MediaCom, telephone service providers T-Mobile, Axion Communications ("Axion"), and Bandwidth.com, and internet domain name registrar and website hosting and email service provider GoDaddy.com, LLC ("GoDaddy"), as well as from speaking with a representative of Axion and reviewing publicly available content on the internet, I have learned the following, in substance and in part:

  a.  The domain name "groupm-ms.com" was registered with GoDaddy using a GoDaddy customer account (the "GoDaddy Account") on or about November 12, 2019. The administrator of the GoDaddy Account (the "GoDaddy Account Administrator") identified themselves to GoDaddy as "William Sadleir," residing at the Beverly Hills Residence, and having the email address groupmms212@gmail.com (the "GroupM Gmail Address") and the Sadleir Cellphone Number. The name "William Sadleir" was also provided as the technical, administrative, and billing contact for the GoDaddy Account, and the domain and email hosting fees for groupm-ms.com were paid for with an American Express card in the name of "William Sadleir" with account number ending in 2000. However, as discussed below, based on my review of customer service audio recordings and phone records, it appears that the GoDaddy Account Administrator was actually the Aviron IT Employee, who established and

---

[8] No bank wiring information was listed on the October 10, 2017 form.

administered the GoDaddy Account for WILLIAM SADLEIR, the defendant.

b.    The email address "a.stevens@groupm-ms.com" (the "Stevens Email Account") was also established through the GoDaddy Account on or about November 12, 2019.  The purported user of the Stevens Email Account was listed as "Amanda Stevens" and as being located in the United States.  However, as discussed in greater detail below, based on my review of IP records, it appears that SADLEIR was actually the user of the Stevens Email Account after it was established by the Aviron IT Employee.

c.    There is currently no website content hosted at the internet URL www.groupm-ms.com.   However, from reviewing historical internet content available at a website that preserves archives of webpages, I was able to review content for that website, and a screen capture of that content is posted below:



d.   For the sake of contrast, a screen capture[9] of the legitimate website for GroupM Worldwide, located at the URL www.groupm.com, is depicted below:



e.   Also on or about November 12, 2019, the same day the Stevens Email Account was established, the Aviron IT Employee contacted a representative of Axion ("Axion Representative-1") both by telephone (with a number ending in 2155, hereinafter the "Aviron IT Employee Cellphone Number")[10] and through email (using the GroupM Gmail Address) about establishing a voicemail account on Axion's network that would have a 212 area code. As discussed above, both MediaCom and its parent company GroupM Worldwide are based in New York, New York, and the 212 area code is associated with that area. Axion's customer service system automatically recorded a series of telephone calls from the Aviron IT Employee on or about November 12, 2019. During one of those calls, in substance and in part, the Aviron IT Employee stated that he had a "dilemma" for which he needed a "solution," that he needed to set up a number with a 212 area code and a voicemail box, and that he did not need the 212 number to be capable of placing outgoing calls. Axion Representative-1 noted that he did not have any 212 numbers available for purchase, but that the Aviron IT Employee could try purchasing a 212 number from another provider and

---

[9] This screen capture was taken on or about March 8, 2020.

[10] In T-Mobile records, the subscriber for the Aviron IT Employee Cellphone Number is listed as the Aviron IT Employee, although with a different spelling of his first name.

transferring it to Axion to set up a voicemail box.  The Aviron IT Employee replied, in substance and in part, "I got to talk to my boss about this and then I will, I will hit you back up."  In a subsequent call on the same day, the Aviron IT Employee informed Axion Representative-1, in substance and in part, that the Aviron IT Employee was able to purchase a 212 number from another service provider, and began arranging to have that number "ported" (*i.e.*, transferred) to the Axion network.  Toll records show that the Sadleir Cellphone Number and the Aviron IT Employee Cellphone Number exchanged calls on or about November 12, 2019 after the Aviron IT Employee Cellphone Number contacted Axion and stated that he needed "to talk to my boss about this," as reflected in the table below:

| Time[11] | Caller | Recipient | Duration |
|---|---|---|---|
| 10:57 a.m. | Aviron IT Employee | Axion[12] | 5:29 |
| 1:35 p.m. | Aviron IT Employee | Axion | 1:20 |
| 3:33 p.m. | Aviron IT Employee | Axion | 3:25 |
| 3:39 p.m. | Aviron IT Employee | Axion | 3:33 |
| 4:23 p.m. | SADLEIR | Aviron IT Employee | 3:02 |
| 4:26 p.m. | Aviron IT Employee | SADLEIR | 1:15 |

        f.    On or about November 13, 2019, the Aviron IT Employee emailed Axion Representative-1 from the GroupM Gmail Address, in substance and in part, "can you setup the email [for the account] to the following and make the name Amanda instead of Eddie please. a.stevens@groupm-ms.com".  Axion Representative-1 replied to the GroupM Gmail Address, in substance and in part, "Email address updated. The name on the extension isn't used for anything, so I just left it as Eddie so if you call in the guys can find it easier."  On or about the same day, the GoDaddy Account Administrator set up a two-factor authentication protocol for the GoDaddy Account with a cellphone number ending in 2155 (the "2155 Authentication Number"), pursuant to which the user of the account would be required to provide an authentication number texted to that cellphone number in addition to using a standard password to make certain changes to the account.  GoDaddy account records do not list the first six digits of the 2155 Authentication Number, but, as noted above, the Aviron IT Employee Cellphone Number also ends in 2155, and thus they appear to be the same phone number.  Further, I have compared Axion customer service audio recordings of the Aviron IT Employee with GoDaddy customer service audio

---

[11] All times listed in this Complaint are in Pacific Standard Time unless otherwise noted.

[12] From reviewing documents provided by Axion, I learned Axion's office telephone number, which ends in 1414.

recordings of the GoDaddy Account Administrator, and based on that comparison the Aviron IT Employee appears to be the GoDaddy Account Administrator.  Thus, it appears that SADLEIR enlisted the Aviron IT Employee in establishing a website for the Sham GroupM LLC and an email account and voicemail box for "Amanda Stevens."

*Sadleir Uses the "Amanda Stevens" Email Account to Deceive the Portfolio Manager*

          g.   On or about November 13, 2019, SADLEIR, using Sadleir Aviron Email Account-2, sent an email to the Stevens Email Account, copying Manager-2, and stating, in substance and in part, "Dear Ms. Stevens: I understand you are likely the person who can validate the available media balance on account for Aviron Pictures.  Aviron participated in the up-fronts in late 2016 and again in 2017, but has not yet applied the media towards marketing campaigns for our films.  Can you please send me an accounting of the Aviron Pictures media balance, along with information about how it can be used, including possible refunds, and the equivalent gross rating points associated with the purchased media?"  The Stevens Email Account responded to SADLEIR at Sadleir Aviron Email Account-2, copying Manager-2, on or about November 14, 2019, and stating, in substance and in part, "Mr. Sadleir: We changed our tracking systems earlier this year.  To facilitate my search and provide the information that you're requesting, please tell me who is (or was) Aviron Picture's media agency of record when the media purchases were made?  Sincerely, Amanda."  The signature block for that email is reproduced below:



The phone number listed in that signature block, (212) 299-4768, is hereinafter referred to as the Stevens Phone Number.

h.   On or about November 14, 2019, the Aviron IT Employee sent an email from his gmail account (the "Aviron IT Employee Gmail Address") to Axion Representative-1 with paperwork for transferring the Stevens Phone Number from another service provider to the Axion network.   That document identified the existing billing contact information for the Stevens Phone Number as "William Sadleir" at the Beverly Hills Residence.[13]

i.   On or about November 15, 2019, the Stevens Email Account sent an email to SADLEIR at Sadlier Aviron Email Account-2, copying Manager-2, stating the following, in substance and in part:

> The summary balance report for Aviron is attached.   There remains a credit of $27,650,000 in total unused media purchases.   Except for $250,000 for print in 2017, all of the media was purchased through the Up-front process for years 2017 and 2018.   Unused media purchased in conjunction with broadcast Up-fronts is refundable only the participation year, and then only with a 90-day advance notice. . . .   Finally, although the media credits are generally not transferable to other clients, we have worked creatively in past situations to help recover value for a client when their media requirements change.

SADLEIR responded to the Stevens Email Account on or about November 22, 2019 from Sadlier Aviron Email Account-2, copying Manager-2, stating, in substance and in part, "can you please provide some times you might be available for a call with me and my colleague, [Manager-2], to review the possible options that you mention in your last paragraph in the email below?"   The Stevens Email Account responded to SADLEIR at Sadlier Aviron Email Account-2, copying Manager-2, "I'm away for the Thanksgiving holiday until December 2 but can speak with you and [Manager-2] upon my return, if necessary."   Manager-2 replied to the Stevens Email Account, also including SADLEIR at Sadlier Aviron Email Account-2, "Hi Amanda, Thank you for the response.   Can we proceed with setting up a time to discuss upon your return."

j.   Also on or about November 15, 2019, the Aviron IT Employee sent an email from the Aviron IT Employee Gmail Address

---

[13] From reviewing documents provided by Google, I have learned, in substance and in part, that the account holder for the Aviron IT Employee Gmail Address is the Aviron IT Employee and that the phone number provided by that account holder for account authentication and recovery purposes is the Aviron IT Employee Cellphone Number.

to Axion Representative-1 stating, in substance and in part, "Can you please change the VM e-mail name to Amanda. Please....." Axion Representative-1 responded, in substance and in part, "It's already set to a.stevens@groupm-ms.com. Do you need me to change something else?" The Aviron IT Employee replied, in substance and in part, "Just the name that show's up when a VM message is e-mailed to that address. It say[s] Eddie."

k.    The Stevens Phone Number was assigned to the Axion telephone network between on or about November 15, 2019 and on or about March 6, 2020.  During that time frame, the Stevens Phone Number did not place any outgoing calls.

l.    On or about December 3, 2019, the Stevens Email Account emailed Manager-2 and SADLEIR at Sadlier Aviron Email Account-2, in substance and in part, "[Manager-2]: I followed up yesterday with my colleague who is pulling together the media details that Mr. Sadlier [sic] requested.  He should have it completed by tomorrow.  It's our busiest time of year, so please excuse the delay."

m.    On or about December 16, 2019, the Fund sent a letter to SADLEIR, Aviron Pictures, Aviron Capital, and Aviron Group, asserting that the Fund would exercise its rights to collateral under the loan and security agreements between the Fund and those entities to take ownership of Aviron Pictures and Aviron Capital and replace SADLEIR as Manager of those entities.

n.    On or about December 17, 2019, the Fund filed a lawsuit against SADLEIR and Aviron in New York Supreme Court, seeking, among other things, to have SADLEIR removed from his positions at Aviron Pictures and Aviron Capital.  The lawsuit was initially filed on an *ex parte* basis, and sought a temporary restraining order, which was granted on the same day the lawsuit was filed.

o.    The next day, on or about December 18, 2019, the Fund served a copy of the temporary restraining order on SADLEIR and Aviron.

p.    On or about December 19, 2019, the Fund's request for a preliminary injunction removing SADLEIR from his position at Aviron Pictures and Aviron Capital was granted, and the Fund was permitted to select a replacement Manager for those entities.

q.    On or about January 6, 2020, GoDaddy records show a login to the Stevens Email Account from an IP Address registered to SADLEIR at the Beverly Hills Residence (the "Sadlier IP

Address").[14]  The Sadleir IP Address also logged in to the Stevens Email Account on or about January 20, 21, 22, 23, 24, 27, 28, 29, 30, and February 17.

r.    On or about January 16, 2020, the replacement Manager for Aviron Pictures and Aviron Capital selected by the Fund (the "Replacement Manager"), sent an email to the Stevens Email Account, stating, in substance and in part, "Hi Amanda, I just left you a voice mail. I'm the new manager of Aviron Pictures. . . .  I'd like to talk to you about the pre-paid media contract summary, attached."   The Stevens Email Account responded, in substance and in part, "My authorized contact at Aviron is Mr. Sadlier [sic]. Can you either have him confirm by email that you are now the authorized representative of Aviron Pictures or provide some other evidence upon which I can rely in responding to you. Also, I'm on maternity leave, but working from home.  If you can please email the questions you have, I'll do my best to provide answers as quickly as possible."

s.    On or about January 22, 2020, the Stevens Email Account sent an email to the Replacement Manager, stating, in substance and in part, "I received your voicemail message. Please send me an email with any questions, and I'll do my best to respond as quickly as possible. Thank you, Amanda".   The Replacement Manager responded, in substance and in part, "We're requesting full refund of the unused portion of the pre-paid media.  It's likely best to talk to you directly to discuss the process and timing."   The Stevens Email Account replied, in substance and in part, "We have already discussed this subject with Mr. Sadlier [sic] at considerable length. I suggest you confer with him. . . . I provided a general accounting to Mr. Sadlier [sic] of the possible 'credits' that may be available at the various networks."

t.    On or about January 29, 2020, SADLEIR, using Sadleir Aviron Email Account-2, sent an email to the Stevens Email Account asking, in substance and in part, for an updated pre-paid media credits report.  On or about January 30, the Stevens Email Account responded to SADLEIR at Sadleir Aviron Email Account-2, adding the Replacement Manager as a recipient for the email and attaching a list of media credits purportedly belonging to Aviron that totaled approximately $27,650,000, and stating, in substance and in part, "[w]hen you're ready to use the credits, simply have your Agency of Record contact me, preferably with a media plan, and we'll notify the various media companies."   The Replacement Manager responded on or about February 4, 2020, dropped SADLEIR from the email chain and added others, and asked, in substance and

---

[14] GoDaddy does not possess IP login data for earlier dates.

in part, for additional documentation concerning Aviron's pre-paid media credits.  The Replacement Manager also noted that "neither Mr. Sadleir nor any other person or entity has the authority to direct you how to use those credits except for me/Aviron Pictures LLC."

u.   On or about January 30, 2020, counsel for Aviron Pictures sent a letter to the Stevens Email Account, stating, in substance and in part, "demand is hereby made for a refund to Aviron for unused Pre-Paid Media in an amount of at least $27.65 million."

v.   On or about February 6, 2020, the Stevens Email Account sent an email to the Replacement Manager, copying others, and stating, in substance and in part, "I will be sending a reply later today to the letter we received from Aviron's attorney." The Replacement Manager responded the next day, on or about February 7, stating, in substance and in part, that he had not yet received the reply letter, and asking for confirmation of the email address of GroupM Worldwide's general counsel (the "GroupM Worldwide General Counsel").

w.   On or about February 7, 2020, outside counsel for Aviron Pictures sent a letter to the GroupM Worldwide General Counsel, copying "Amanda Stevens" and others, and, in substance and in part, reiterating a demand for a refund of Aviron Pictures' pre-paid media credits.  The letter also noted that "[a] copy of our letter, dated January 30, 2020, to your colleague Amanda Stevens on this matter is attached hereto."

x.   On or about February 8, 2020, the Stevens Email Account sent an email to the Replacement Manager, copying SADLEIR at Sadleir Aviron Email Account-2, counsel for Aviron, an associate of the Replacement Manager, and Manager-2, and stating, in substance and in part, "This is in response to the demand for a refund notice that we received from Aviron Picture's attorney, dated January 30, 2020. We are not aware of any previous requests by Aviron for a refund, as claimed in [Aviron's counsel]'s letter. Nonetheless, it is our position that no refunds will be made by GroupM Media Services or any of the associated media companies and that only media credits remain available to Aviron."

y.   On or about February 24, 2020, the GroupM Worldwide General Counsel sent an email from her email address, ending in "@groupm.com," to outside counsel for Aviron Pictures, stating, in substance and in part, "I acknowledge receipt of your letter dated 7 February 2020. Please note my correct contact details.  I note that you have sent the letter to an Amanda Stevens, I have no

record of such a person so please do let me know if you have received any response.  I will look into this matter with the agency concerned and revert to you as soon as possible."

        z.   On or about February 25, 2020, a call placed to the Stevens Phone Number was directed to a voicemail box, which played the following recorded message, in substance and in part, in what appears to be a woman's voice: "Hi, this is Amanda Stevens at GroupM Media Services.  I'm either on a call or away from my desk. Please leave your name, number, and a brief message, and I'll get back to you.  Thank you."

        aa.  On or about February 28, 2020, the GoDaddy Account Administrator (who, as discussed above, appears to be the Aviron IT Employee) deleted the mailbox for the Stevens Email Account. Also on that date, SADLEIR and the Aviron IT Employee exchanged a series of calls, and shortly thereafter the Aviron IT Employee called Axion, as detailed in the table below:

| Date/Time  | Caller             | Recipient          | Duration     |
|------------|--------------------|--------------------|--------------|
| 1:55 p.m.  | SADLEIR            | Aviron IT Employee | No connect.  |
| 1:55 p.m.  | Aviron IT Employee | SADLEIR            | 0:03         |
| 1:57 p.m.  | Aviron IT Employee | SADLEIR            | 5:37         |
| 2:11 p.m.  | Aviron IT Employee | SADLEIR            | 1:09         |
| 2:33 p.m.  | Aviron IT Employee | Axion              | 2:44         |

Axion's customer service system automatically recorded the telephone conversation between the Aviron IT Employee and an Axion representative ("Axion Representative-2") on or about February 28, 2020.  During that call, the Aviron IT Employee requested, in substance and in part, that Axion "cancel" the Stevens Phone Number and "just let it be a dead end."

        bb.   On or about March 2, 2020, at approximately 10:23 a.m., the Aviron IT Employee Cellphone Number placed an approximately 10-minute phone call to the Sadleir Cellphone Number.  Approximately one hour after that call, between 11:22 a.m. and 11:29 a.m., GoDaddy records show that the GoDaddy Account Administrator cancelled his account registration and hosting of the domain groupm-ms.com.  Less than one hour later, at approximately 12:09 p.m., the Aviron IT Employee Cellphone Number placed a call to a GoDaddy customer service line.  The Aviron IT Employee Cellphone Number then placed two calls to Axion over the

course of the next several hours.  The following table details
this series of phone calls:

| Date/Time | Caller | Recipient | Duration |
|-----------|--------|-----------|----------|
| 10:23 a.m. | Aviron IT Employee | SADLEIR | 10:08 |
| 12:09 p.m. | Aviron IT Employee | GoDaddy[15] | 8:22 |
| 12:58 p.m. | Aviron IT Employee | Axion | 0:25 |
| 1:34 p.m. | Aviron IT Employee | Axion | 4:54 |

From my review of Axion customer service recordings from on or
about March 2, 2020, I learned, in substance and in part, that in
the first phone call to Axion listed in the table above, the Aviron
IT Employee asked to speak with Axion Representative-1, but was
informed by Axion Representative-2 that Axion Representative-1 was
not in the office at the time.  In the second phone call, the
Aviron IT Employee asked Axion Representative-2, in substance and
in part, whether Axion had a means of looking up information about
a particular phone number to "see where it goes to," and claimed
that his question related to a call the Aviron IT Employee had
received from someone trying to serve legal documents on one of
his relatives regarding a debt.  Axion Representative-2 responded
that Axion previously used a particular website to look up
information about phone numbers, but that website was taken down.

          cc.     On or about March 4, 2020, the Aviron IT Employee
contacted the GoDaddy customer service line about the GoDaddy
Account, with customer service notes being made in the account's
electronic file between approximately 12:54 p.m. and 1:07 p.m.
Phone records show an approximately 28 minute call from the Aviron
IT Employee Cellphone Number to GoDaddy at or about 12:38 p.m. on
the same day.  The latter half of the ensuing call between the
Aviron IT Employee and a GoDaddy customer service representative
was recorded by GoDaddy.  In the beginning of the call, according
to GoDaddy customer service notes, the Aviron IT Employee stated,
in substance and in part, that the Aviron IT Employee had deleted
his domain with GoDaddy but that the Aviron IT Employee's account
information was still accessible on a GoDaddy internet domain
registration database.  As discussed above, that user account
information would have included the name "William Sadleir."[16]   A

---

[15] According to GoDaddy's website, (480) 463-8390 is one of the
numbers for its sales and support team.

[16] From reviewing documents provided by GoDaddy, I know that the
GoDaddy Account's user contact information was shielded by a
privacy service from on or about November 12, 2019 to on or about
March 2, 2020.  However, that information became visible on public

GoDaddy representative informed the Aviron IT Employee, who the GoDaddy representative referred to as "William," in substance and in part, that it takes time for user information to be removed completely from GoDaddy's domain registration database, and "it is true that your name is still there, but don't you worry. Like I said, we will be able to make it disappear within this day."

dd.     The next day, on or about March 5, 2020, the Aviron IT Employee Cellphone Number placed a call to the Sadleir Cellphone Number that lasted for approximately two minutes and 17 seconds.

ee.     On or about March 7, 2020, the Aviron IT Employee contacted the GoDaddy customer service line again about the GoDaddy Account, with customer service notes being made in the customer file between approximately 3:03 p.m. and 3:25 p.m.  Phone records show an approximately 31 minute call from the Aviron IT Employee Cellphone Number to GoDaddy at or about 2:53 p.m. on the same day. The ensuing call between the Aviron IT Employee and a GoDaddy customer service representative was recorded by GoDaddy.  On that call, the Aviron IT Employee identified himself as "William," and provided a customer number, PIN number, and a separate number texted to the Aviron IT Employee(at the 2155 Authentication Number, which as discussed above appears to be the Aviron IT Employee Cellphone Number) during the call as part of a two-factor authentication process.   The Aviron IT Employee stated, in substance and in part, that his account information was still accessible on a GoDaddy internet domain registration database despite multiple requests to remove it, and that "I'm a very private person and this was a venture I was going to do that I decided not to and I'd like for it to be removed."  The GoDaddy customer service representative responded, in substance and in part, that the account information would be removed from GoDaddy's internet domain registration database that day.

ff.     Three days later, on or about March 10, 2020, the Aviron IT Employee Cellphone Number placed a call to the Sadleir Cellphone Number that lasted for approximately two minutes and seventeen seconds.

14.  From speaking with a representative of GroupM Worldwide (the "Legitimate GroupM Representative"), I have learned, in substance and in part, that the Sham GroupM LLC is not associated in any way with GroupM Worldwide, and that neither the Stevens

---

internet domain registration databases when the GoDaddy Account Administrator cancelled various account features, including a privacy feature, when he deleted his domain registration on or about March 2, 2020.

Email Account nor the Stevens Phone Number have ever been used by a GroupM Worldwide employee. Further, based on a review of records for employees in the United States, the Legitimate GroupM Representative has found no record of any GroupM Worldwide employee named "Amanda Stevens."

15.   Based on the foregoing, it appears that the Sham GroupM LLC was created by WILLIAM SADLEIR, the defendant, to misappropriate funds that SADLEIR claimed were provided to GroupM Worldwide, that "Amanda Stevens" is a fake identity created at SADLEIR's direction, that the "Amanda Stevens" identity as well as the Stevens Email Account and domain groupm-ms.com were created at SADLEIR's direction to conceal and further SADLEIR's efforts to misappropriate investor funds, and that SADLEIR himself posed as Amanda Stevens when engaging in email exchanges with a representative from the Fund.

## THE UCC SCHEME

16.   From reviewing documents provided by the Fund, including emails, contracts, affidavits and other documents filed in court by the Fund, and other materials, and documents provided by the Delaware Secretary of State, I have learned the following, in substance and in part:

a.   In or about 2017 and 2018, certain UCC filings were made in Delaware to secure the Fund's loans to Aviron. Specifically, those UCC filings secured the Fund's loan with certain intellectual property and other assets relating to the films *My All American*, *Drunk Parents*, *Kidnap*, *The Strangers: Prey at Night*, *Destination Wedding*, and potential future Aviron films.

b.   As discussed above, at least as early as on or about July 9, 2019, the Fund notified Aviron that it had defaulted on its loan payment obligations to the Fund.

c.   On or about July 15, 2019 and on or about September 16, 2019, a law firm representing Aviron arranged for the electronic filing of a total of approximately fourteen UCC amendments with the Delaware Secretary of State representing that the Fund consented to the deletion of its security interest in certain intellectual property and other assets that served as collateral for the Fund's loans to Aviron (the "Fraudulent UCC Filings"). Specifically, on or about July 15, 2019, an individual in the law firm's Los Angeles office filed a total of eleven UCC amendments relating to the Fund's secured interests in *My All American*, *Kidnap*, *The Strangers: Prey at Night*, and *Destination Wedding*, and on or about September 16, 2019, an individual in the

law firm's Manhattan office filed a total of three UCC amendments relating to the Fund's secured interests in *The Strangers: Prey at Night*.  These UCC amendments allowed Aviron to sell or refinance several of the movie rights that served as collateral for the Fund's loans to Aviron.  However, the Fund never in fact consented to the Fraudulent UCC Filings or to the deletion of UCC liens on the collateral set forth in those filings, and the representations made to that effect in the filings were false.  As set forth below, the Fraudulent UCC filings appear to have been made based on releases that contained forged signatures from a representative of the Fund.[17]

   d. The Fund has estimated that the assets sold or refinanced by WILLIAM SADLEIR, the defendant, and Aviron as a result of the Fraudulent UCC Filings were worth approximately $3 million.

   e. On or about October 22, 2019, outside counsel for the Fund sent an email to Aviron's general counsel at the time (the "Former Aviron General Counsel"), copying several other lawyers for the Fund, stating, in substance and in part, that lien searches on behalf of the Fund had revealed several UCC filings "releasing collateral" and that "We're trying to piece this all together.  We're familiar with the release for Strangers and Destination Wedding (attached) but not the others or when/how [the Fund] authorized the amendments.  Can you give me a call to walk me through this or let me know who I can contact at [Aviron's outside counsel]?"  The Former Aviron General Counsel responded on or about October 24, 2019, copying, among others, SADLEIR, and stated, in substance and in part, that he had "not reviewed" the Fraudulent UCC filings but that counsel for the Fund were "fully involved" and "may even have commented on the very UCCs about which you are inquiring – so for sure [the Fund] knew what it was doing and why."

   f. On or about October 25, 2019, outside counsel for the Fund sent another email to the Former Aviron General Counsel, copying several other lawyers at the Fund, again inquiring about the Fraudulent UCC filings and asking, in substance and in part, "[w]ho is the best contact to discuss this with?  Do you know who at or on behalf of [the Fund] approved the UCC-3s?"  SADLEIR responded to that email (for which SADLEIR was not a recipient) using Sadleir Aviron Email Account-2, without copying anyone else,

---

[17] The releases themselves do not appear to have been filed with the Secretary of State's Office, but rather provided to counsel for Aviron, who then filed the UCC amendments based on the releases.

stating, in substance and in part, "I'm probably the best contact for now to discuss the license sales," and, in a later email sent the same day, that SADLEIR would "pull together funds flow you asked for" and that "[w]e'll get this cleaned up."

g.    On or about November 25, 2019, Manager-2 spoke with SADLEIR by phone.  During that call, SADLEIR stated, in substance and in part, that SADLEIR sold certain motion picture rights—to which the Fund had perfected security interests pursuant to the 2017 Note Agreement—to a third party (the "Third Party Buyer"), and that SADLEIR had done so to pay the outstanding liabilities of Aviron.  When Manager-2 informed SADLEIR that SADLEIR needed the Fund's approval to do so, SADLEIR admitted that he had "f----d up" and had taken the Fund's signature pages from an unrelated transaction to effectuate the fraudulent sale.  After this phone call, also on or about November 25, 2019, Manager-2 sent SADLEIR an email asking him, in substance and in part, to "share as promptly as possible the documents utilized to facilitate the sale of assets to the Third Party Buyer and the detailed funds received and the allocation of the same."  SADLEIR never responded to this email.

h.    On or about December 12, 2019, Los Angeles-based outside counsel for Aviron sent an email to Chicago-based outside counsel for the Fund attaching five purported signed releases from the Fund that supported the filing of the Fraudulent UCC Filings (the "Fraudulent Releases").  The Fraudulent Releases were dated between on or about July 12, 2019 and on or about July 17, 2019, related to interests in the films *My All American*, *Kidnap*, *The Strangers: Prey at Night*, and *Destination Wedding*.  Each of those releases bears the purported signature of Manager-1.

i.    As discussed above, on or about December 16, 2019, the Fund sent a letter to SADLEIR, Aviron Pictures, Aviron Capital, and Aviron Group, asserting that the Fund would exercise its rights to collateral under the loan and security agreements between the Fund and those entities to take ownership of Aviron Pictures and Aviron Capital and replace SADLEIR as Manager of those entities. The following day, on or about December 17, 2019, the Fund filed a lawsuit against SADLEIR and Aviron in New York Supreme Court, seeking, among other things, to have SADLEIR removed from his positions at Aviron Pictures and Aviron Capital.

j.    I have reviewed an affidavit signed by Manager-1, and filed in New York Supreme Court in connection with the Fund's lawsuit against SADLEIR and Aviron, in which Manager-1 stated, in substance and in part, that he did not sign the Fraudulent Releases or authorize them.  Manager-1's signatures on those documents

appear to have been created by copying Manager-1's signature from other documents and pasting it on the Fraudulent Releases.

WHEREFORE, deponent prays that an arrest warrant be issued for WILLIAM SADLEIR, the defendant, and that SADLEIR be imprisoned or bailed, as the case may be.


s/ Daniel Mardakhayev
ByKNF,USMJ
_____
DANIEL MARDAKHAYEV
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Attested to before me by reliable electronic means this 18th day of May, 2020

_____
HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK